UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

LARRY DEMETRIUS PEARSON,                    CIVIL NO. 10-4622 (DWF/JSM)

       Petitioner,

v.                                                      **REPORT AND RECOMMENDATION**

JESSICA SYMMES, Warden,

       Respondent.

_____

      This matter is before the undersigned United States Magistrate Judge on Larry Demetrius Pearson's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1]. The case has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

**I.    INTRODUCTION**

      On May 23, 2007, a jury convicted Petitioner of first and second-degree murder of Corodarl Merriman ("Corodarl") and felon-in-possession of a firearm. Petitioner was sentenced to the term of life imprisonment without the possibility of parole and a concurrent 60-month sentence on the felon-in-possession conviction.  On May 30, 2008, Ramsey County District Judge Steven Wheeler held a post-conviction petition hearing on Petitioner's claim of ineffective assistance of trial counsel. See Exhibit List[1] [Docket No. 6], Ex. B (Post Conviction Hearing Transcript).  On September 23, 2008, Judge Wheeler denied the petition.  On November 25, 2009, Petitioner appealed his conviction to the Minnesota Supreme Court on several grounds, including that his trial counsel failed to fully pursue the suppression of a videotaped statement introduced into

_____
[1]    Hereinafter referred to as "Ex."

evidence, failed to properly redact the videotape, and failed to examined the decedent's brother about Corodarl's prior bad acts as a juvenile after he testified that Corodarl was a peacemaker.  See State v. Pearson, 775 N.W.2d 155, 165 (Minn. 2009).

With regards to Petitioner's claims of ineffective assistance of counsel, the Minnesota Supreme Court found as follows:

> To establish ineffective assistance of counsel, Pearson must prove that his "counsel's representation fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome [of the proceeding] would have been different but for counsel's errors." State v. Lahue, 585 N.W.2d 785, 789 (Minn.1998). A strong presumption exists in favor of finding that counsel's representation was reasonable, and particular deference is given to matters of trial strategy, including which witnesses to call and what information to present to the jury. Id. at 789–90. Moreover, a reasonable probability requires "a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
>
> * * *
>
> Pearson alleges that his trial counsel failed to fully pursue the suppression of the videotape, failed to properly redact the videotape, and failed to elicit information about Corodarl's prior acts. The postconviction court denied Pearson's ineffective assistance of counsel claims because it could not say that there was "a reasonable probability that, but for counsel's possible errors, the result of the proceeding would have been different." The court also gave a "high degree of deference" to the conduct of Pearson's counsel and concluded that there was "no basis for a finding of ineffective assistance of counsel." With respect to the videotape, having already concluded that its admission did not affect Pearson's substantial rights, we also conclude that there is no reasonable probability that, but for Pearson's counsel's alleged errors, the outcome of the proceedings would have been different.
>
> Pearson also alleges that his trial counsel should have cross-examined Willie about Corodarl's prior bad acts as a juvenile after Willie testified that Corodarl was a peacemaker. Decisions about evidence and objections are

2

> matters of trial strategy. See Leake v. State, 737 N.W.2d
> 531, 542–43 (Minn. 2007). We give particular deference to
> and will not second-guess the decisions of counsel regarding
> trial strategy. Id. at 536; Lahue, 585 N.W.2d at 789. Because
> we conclude that the claimed ineffective assistance here
> involves trial strategy, we hold that Pearson's ineffective
> assistance of counsel claim necessarily fails.

Id.

On November 16, 2010, Petitioner filed the instant habeas corpus petition, in which he asserted an ineffective assistance of counsel claim based on the following supporting facts, "[w]here the defense was lack of premeditation and self-defense, ineffective of counsel [sic] for failing to cross-examine the only eyewitness about his untruthful characterization of the complainant as a peacemaker who had never been in trouble." Petition, p. 5; see also Supplement to Petition [Docket No. 7], p. 2. In addition, Petitioner challenged his trial counsel's failure to move to suppress a videotaped interrogation when it should have been suppressed. See Supplement to Petition [Docket No. 7], p. 3.

## II.   FACTUAL BACKGROUND

Willie Merriman ("Willie"), Corodarl's older brother, testified at trial as follows: on April 22, 2006, he and Corodarl drove together in his van to a gas station. See Ex. A (Trial Transcript) ("Tr."), 961-62. While at the gas station, Petitioner approached Willie and Corodarl and let them know he had weed for sale. Tr. 962, 964-65. Petitioner told them he had a pound of weed for six hundred dollars, but Willie told him he only had $400 and asked for Petitioner's number so he could call him later. Tr. 965-66. Eventually, Willie and Corodarl agreed to follow Petitioner in his Blazer and followed him to an apartment complex on White Bear Avenue. Tr. 967. Petitioner told Willie to come

3

by the Blazer.  Tr. 1057.  Willie got out of the van, went over and stood with his back to the Blazer with Petitioner standing next to him on the right.  Tr. 1062.  Willie asked Petitioner to see the weed. Tr. 1068.  Petitioner then pulled a gun, stepped in front of Willie, pointed the gun at Willie's head and fired.  Tr. 977-78.  Petitioner missed and Willie ran to an alleyway around the side of a garage.  Tr. 978.  Petitioner did not shoot at Willie again.  Tr. 1088-89.  Willie could not hear much at that time because the gun went off so close to his head, but he observed Petitioner approach the van on the front passenger side and shoot into the passenger window at Corodarl, who was seated in the passenger seat and was trying to get out through the back of the van.  Tr. 979-81. Petitioner also opened the front passenger door, leaned on the seat and started to shoot downwards.  Tr. 981, 983.  Willie ran up to the van, grabbed Petitioner and tried to get the gun from him, only to be grabbed from behind by a man dressed in army fatigues.  Tr. 1082-83.  The man in the army fatigues and Petitioner then ran off to the side of the apartment building.  Tr. 985.

Willie found Corodarl in the middle of the seats towards the back of the van.  Tr. 1089-90. Willie then got into the vehicle and drove off to a convenience store and asked someone to call the police or an ambulance.  Tr. 986-87.  Willie also testified that there was a bat in his van and admitted discussing with Corodarl that they did not trust Petitioner and that if anything happened, they were going to get the bat out.  Tr. 1004-05.

Witness Calvin Nesbitt testified that on April 22, 2006, he saw Willie who told him to call 911, as someone had shot his brother, and observed Willie get out of his van at the convenience store and hand a 9mm Berretta handgun to someone and then drive

4

away with his brother.  Tr. 1723-25.  Nesbitt, a convicted felon, testified at trial that he knew Petitioner because the boy he raised as a son was the boyfriend of Petitioner's sister.  Tr. 1727.  Ramsey County Deputy Tami Alba testified that she overheard Petitioner refer to Nesbitt as his "homeboy" or in other words, his pal.  Tr. 1833, 1893-95.

Willie spoke later that day to Officer Dylan Flenniken and told him that he and Corodarl wanted to buy marijuana from Petitioner.  Tr. 1040-41, 1106.  Officer Flenniken testified that Willie told him that when they reached the apartment building, Petitioner went to the building, appeared to exchange something with an individual wearing a camouflage shirt, and then Petitioner walked back towards the van when the confrontation started.  Tr. 1107-08.  Willie also spoke with Sergeant Tom Bergren and told him that Corodarl had asked about buying weed and that Willie told him that he they had to go home.  Tr. 1043.  On August 25, 2006, Willie told Sergeant Bergren that both he and Corodarl wanted to buy some weed and Petitioner stated that he had some for sale.  Tr. 1043-44.  During his grand jury testimony in November 2006, Willie testified that he ran into Petitioner at the gas station and told Petitioner that he wanted to buy some weed from him.  Tr. 1044.

Willie acknowledged that his nick-name was "Kill At Will" and that his prior convictions included assault in the third degree, making terroristic threats, fleeing police in a motor vehicle, drug sales, criminal damage to property, and providing false information to a police officer.  Tr. 1084.  Willie also testified that "Kill At Will" was his rap music name.  Tr. 1091.

As it relates to Corodarl, the following testimony was elicited from Willie:

> Q.      Now, Mr. Merriman, you've been in some trouble in your life.  Tell me about your brother.  Was he ever in trouble?
>
> A.      No.  He was basically a peacemaker.  I mean, he had his, you know, problems, but he was a peacemaker.

Tr. 959.

During the post-conviction hearing, Tamara Lynn Leja, trial counsel for Petitioner, testified that she did not object to this testimony.  See Exhibit B (Post-Conviction Hearing), p. 9.  Leja stated that her failure to object was not a strategic decision on her part and that she did not object to that testimony because she did not catch the testimony.  Id.  Leja had in fact represented Corodarl in a criminal damage to property prosecution that involved him breaking through windows at his girlfriend's home.  Id., pp. 9-10.  This information was not in her immediate memory at the time of the trial and she did not intentionally withhold this information.  Id., p. 10.   Leja also testified she had Corodarl's juvenile record, which indicated that Corodarl had been charged with aggravated robbery, to which he ultimately pled guilty to simple robbery.  Id., pp. 10-11; see also Ex. E (Juvenile Criminal Records).  She did not recall learning about the charge that Corodarl aided and abetted in the shooting of an individual as a part of a robbery.  Id., p. 11.  She did recall that as part of the juvenile record, Corodarl had been adjudicated guilty of a third-degree drug sale offense and a second-degree assault with a dangerous weapon.  Id., p. 12.  Leja testified that she and co-counsel in preparing for the case reviewed that rules of evidence, and it was their understanding that those adjudications could not have been used as impeachment.  Id., p. 13.  Trial counsel did not reconsider using the evidence after Willie's testimony.  Id.  Trial counsel did attack the credibility of Willie through his criminal record.  Id., p. 31.

Co-trial counsel Katherine Pruitt also testified at the post-conviction hearing that they did not seek to cross-examine Willie on Corodarl's juvenile criminal record because they would not have been able to admit the evidence.  Id., p. 35; see also Exhibit C (Affidavit of Attorney Tamara L. Leja), ¶ 7 ("Willie Merriman was not questioned about Corodarl Merriman's juvenile adjudications based on Minnesota Rule of Evidence 609(d) and the corresponding comments"); Exhibit D (Affidavit of Attorney Kathy Pruitt), ¶ 3 (same).

Petitioner testified at the trial that he had been convicted of three separate felonies for robbery.  Tr. 1578.  Petitioner admitted that he was ineligible to possess a firearm due to his convictions.  Tr. 1635.  Petitioner was supporting himself by selling crack, cocaine and marijuana.  Tr. 1580, 1582.  On April 22, 2006, Petitioner stopped at a gas station to get gas.  Tr. 1585.  He did not have a chance to get gas, as he was approached by Willie.  Tr. 1585.  Willie invited Petitioner to a house party and showed him a flier.  Tr. 1586.  Petitioner declined the invitation.  Id.  The two were talking about their respective drug dealing, when Petitioner offered to sell Willie an ounce of crack cocaine for $600.  Tr. 1588-90.  Petitioner could make $1,800 an ounce of crack.  Tr. 1701.  Petitioner also wrote down his cell phone number for Willie on the party flier.  Tr. 1591-92.  Petitioner was not intending to sell to Willie because he knew what kind of person Willie was; he only told Willie to call him in about an hour and then left the gas station.  Tr. 1595.  Petitioner then called his friend, Lorenzo Tucker, and told him to come with him to buy new drugs, as he had run out earlier in the day.  Tr. 1597.  Petitioner went back to his apartment, grabbed some money to buy new drugs and then grabbed his gun in order to protect himself.  Tr. 1598.  Petitioner said goodbye to

7

Tucker, and headed towards his vehicle when Willie called him over to his van.   Tr.
1601-02.  Petitioner went over, got into the van and sat in the front passenger seat.   Tr.
1602.  Petitioner had not expected Willie to be there, but still entered the vehicle, since
he never had a problem with Willie.   Id.  Petitioner told Willie that he needed to go get
some new drugs.   Tr. 1603.   The passenger in the back seat, Corodarl, said to Willie
"come on man. . . are you scared?"   Tr. 1604.   Petitioner did not see Corodarl in the
vehicle when he entered.   Tr. 1637.    Corodarl then jumped out of his seat, stood up,
pulled a 9mm automatic gun from his waist and pointed it towards Petitioner's head.   Tr.
1605, 1640-43.  Willie told Petitioner to "give it up."   Id.  Petitioner believed that Corodarl
and Willie were trying to rob him.   Tr. 1638.   Willie had a baseball bat.   Tr. 1606.
Petitioner grabbed his gun out of his pocket with his left hand, although he is right
handed, and fired, hitting Corodarl in the back of his thigh.   Tr. 1607, 1642.   Petitioner
then tried to get out of the van on the driver's side front seat, and follow Willie, but did
not make it outside of the van as Corodarl grabbed his left wrist and pulled Petitioner
towards him.   Tr. 1608, 1646, 1648.   Petitioner then shot Corodarl in the back of his left
arm.   Tr. 1608, 1648.   Id.  Corodarl was able to pull Petitioner into the back seat.   Tr.
1608, 1655.   Id.  Petitioner then shot Corodarl in the ear, for a total of three shots fired.
Tr. 1608-09.   When he shot Corodarl in the ear, Petitioner was on top of him and
Corodarl's gun was on the ground.   Tr. 1655.   After each time he fired his revolver,
Petitioner was required to pull back the hammer.   Tr. 1609, 1656.   Petitioner got out of
the passenger side of the van and made his way back to his vehicle only to be grabbed
from behind by Willie, who tried to grab the gun from him.   Tr. 1610-11.   During the
struggle, the gun went off and Willie let go.   Tr. 1611. Petitioner did not know how the

8

passenger window of the van had been broken, but acknowledged that there was broken glass in the parking lot of the apartment complex and next to van when police reached the van.  Tr. 1658, 1691-92. Petitioner got into his vehicle, drove off and went to his cousin's apartment.  Tr. 1612.  Petitioner asked for some bleach from his cousin's girlfriend in order to get rid of the blood and gunpowder residue off his hands.  Tr. 1138-39, 1612-14.  Petitioner admitted that the gun that killed Corodarl belonged to him.  Tr. 1689.

After his arrest, Petitioner spoke with police Officer Aguirre.  Tr. 1617.  Petitioner asked to speak with Officer Aguirre because he was best friends with his brother.  Tr. 1617.  Petitioner asked Officer Aguirre when he would be able to make phone calls.  Tr. 1618. Officer Aguirre told him that he had to talk to him if he wanted to make any calls, although he admitted that he chose to talk to Officer Aguirre and was not forced to do so.  Id.  Officer Aguirre read Petitioner his Miranda rights at the beginning of the interview and Petitioner signed the Miranda form.  See Ex. G (Transcript of Recorded Interview), p. 2; Ex. K (Video of Interview).  Prior to giving Petitioner his Miranda rights, Officer Aguirre noted that Petitioner had previously asked for an attorney.  See Ex. G, p. 2.[2]

---

[2]     The dialogue between Officer Aguirre and Petitioner surrounding reading to Petitioner his Miranda rights was as follows:

> INTERVIEWER [Aguirre]:  The lady who in, inside my pod. All right. Here's the deal. As soon as I got the call from lady, [inaudible], I called the sergeant and I said, hey, you know Larry called me and he wants me, to talk to me, I went and talked to him. They made me get rid of some of this just because legally [inaudible] I can't even, they won't even let me in here, because first of all, I've never done this, I've

Petitioner testified at trial that he lied to Officer Aguirre during his interview by telling him that he did not know anything, he was not the shooter and he had been at his "crib" all day.  Tr. 1619, 1678-79.  Petitioner asked questions of Officer Aguirre to find out what witnesses were say about him and to get information about what evidence the

_____

never been down here. [inaudible] can we go, just go over this really quick before we talk?
Pearson: Yeah, I signed it.

INTERVIEWER [Aguirre]:  Yeah, I know. I know. I know. But since you asked for a lawyer before... [inaudible] is that cool?

Pearson:  Yeah.

INTERVIEWER [Aguirre]: All right. Just read along with me and initial ...

Pearson: Let me see this real quick.

INTERVIEWER [Aguirre]: Well, let me read it through.

Pearson: Go ahead.

INTERVIEWER [Aguirre]: You have the right to remain silent and refuse to talk at any time or answer any questions taken or asked by the police officer. Anything you do or say can be used against you. You have a right to talk to a lawyer and have a lawyer with you during any questioning. If you cannot afford a lawyer, one will be appointed for you. And you may remain silent until you have talked to a lawyer. The above rights have been read to me. I have initialed each paragraph to show that 1understand each of my rights. I have received a copy of this form. I have signed it and my name's on it. And we'll just list 2:30 or so?

Pearson: So basically, this is for court?

INTERVIEWER [Aguirre]: My understanding that it could be. So, let me ask you this, what's up? This is my day off, man.

See Ex. G, p. 2.

police had.  Tr. 1677, 1680.  At one point, Officer Aguirre left the room, came back in and told Petitioner that police had found the murder weapon at the apartment where he had been arrested, to which Petitioner replied that they did not find the firearm in his possession.  Tr. 1682-83.  He denied it was his gun.  Tr. 1683.  Petitioner never told Officer Aguirre the he killed Corodarl in self-defense.  Tr. 1679, 1687.

Trial counsel Pruitt testified at the post-conviction hearing that although counsel initially brought a motion to suppress the statement given by Petitioner, on the basis there may have been a <u>Miranda</u> or <u>Scales</u> violation, after listening and watching the recording, counsel determined that there was no basis for such a challenge and withdrew the motion.  <u>See</u> Exhibit B, p. 39.  Tr. 1515-17.  The state introduced the interview as rebuttal evidence.  Tr. 1840-41.  Defense counsel objected to admission of the evidence as being cumulative impeachment evidence, as Petitioner had already admitted to lying during the interview with Officer Aguirre.  Tr. 1841.  The state argued that it was not offering the interview as impeachment evidence, but rather as evidence going to the credibility of a party opponent and to rebut his version of events on the stand.  Tr. 1843-46.  Defense counsel countered that the state was attempting to use the videotape to "clean up" portions of the cross-examination that were not previously covered and reiterated that this evidence was not needed for rebuttal since Petitioner had already admitted he had lied during the interview.  Tr. 1847.  The court overruled the objection, finding that the videotape was the best and fairest way for the evidence to come in, it gave the jury an opportunity to view his interview rather than hear about it

through cross-examination, and it permitted the jury to observe his demeanor, which was relevant to his credibility on the stand.[3]  Tr. 1877-80.

The videotape of the interview showed Petitioner in his orange prison jumpsuit, asking Officer Aguirre for information about what the police knew about the murder, denying his involvement in the murder or knowing anything about the murder, asking what the bail would be and stating that he had enough money for a million dollar bail, stating his girlfriend was pregnant and he was "cool" with the fact that she was probably not going to have the baby.  See Exhibits G, K.

Defense counsel Pruitt testified at the post-conviction hearing that it was not a strategic decision on her part to not redact references by Petitioner to an attorney during the interrogation, references regarding the bail amount he was facing or that he was facing a life sentence, or he was fine with his girlfriend's decision to terminate their pregnancy.  See Exhibit B, pp. 39-40.  Counsel did not redact this information because it did not occur to her to do so at the time, as they were more concerned about other matter regarding his case.  Id., p. 40.

Assistant Medical Examiner, Dr. Kelly Mills, M.D. testified at trial that she conducted an autopsy of Corodarl.  Tr. 1252.  Dr. Mills testified that the shot to Corodarl's head at the ear was fired at six inches or closer.  Tr. 1254.  The shot travelled slightly upwards and the wound was from front to back.  Tr. 1280.  The shot to Corodarl's head would have killed him instantly.  Tr. 1256-57.  The shot to the arm was at the back of the arm by the elbow of the left arm, traveled downward and entered into the left side of the chest cavity.  Tr. 1257, 1260.  The shot could not have occurred while

---

[3]     The parties had come to agreement to redact certain portions of the video.  Tr. 1880-81.

Corodarl was laying down.  Tr. 1274.  This shot punctured Corodarl's lung, stomach, diaphragm and went through the spinal cord.  Tr. 1257.  The shot was fired up to 36 inches away and would have immediately caused paralysis from the waist down.  Tr. 1258-59.  The shot to the leg traveled "kind of on the back of the right thigh," went through the penis and scrotum and entered into the left thigh.  Tr. 1259.  Corodarl would have suffered pain from this shot.  Id.  According to Dr. Mills, the shot to the thigh was consistent with the testimony that the shot came from the passenger window and would not have been consistent with any other position other than Corodarl being seated down.  Tr. 1272, 1285.  In addition, Dr. Mills detected a low level of the drug ecstasy in his blood and urine.  Tr. 1263.

Blood found in the van was located in the middle seats and the third row.  Tr. 1449-68, Exs. I, J.  Both side's experts testified that the blood splatter evidence was consistent with both Petitioner's and Willie's testimony.  Tr. 1449-68, 1789-1802.

Sergeant Bergren testified that he went to the scene of the shooting after speaking with Willie.  Tr. 1366.  One of the bullets remained unaccounted for from the revolver.  Tr. 1322-23, 1365.  Sergeant Bergren stood by where the van and Blazer would have been on the day of the shootings and acted out what Willie said had happened in order to determine where the missing bullet had gone.  Tr. 1368.  Based on this reenactment, Sergeant Bergren looked at a garage at the height level that Willie claimed the shot at him by Petitioner had been made (at head level).  Tr. 1368-69. Sergeant Bergren located a bullet that was consistent with the bullets that had been fired by Petitioner's revolver and had a trajectory placing the bullet being fired from the parking lot where the shooting had taken place.  Tr. 1393-94, 1441-42, 1444-49.

13

## II.     STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners.  Section 2254 of the AEDPA provides that a district court will entertain a petition for writ of habeas corpus submitted by a person in custody pursuant to a state court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

In addition, 28 U.S.C. § 2254 provides that a habeas corpus petition:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Here, while Petitioner does not explicitly state whether he was proceeding under 28 U.S.C. § 2254(d)(1) or (2), it is evident from the substance of his Petition that he is raising challenges under both § 2254(d)(1) and (2).

The Court of Appeals for the Eighth Circuit has described the review under § 2254(d)(1) as follows:

> A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or if it "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrived at an opposite result. Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146

14

> L.Ed.2d 389 (2000). A state court "unreasonably applies" federal law when it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.
>
> A federal court may not issue the writ simply because it "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Engesser v. Dooley, 457 F.3d 731, 735-36 (8th Cir. 2006).  Under this standard, the federal court "must deny a writ – even if we disagree with the state court's decision – so long as that decision is reasonable in view of all the circumstances."  May v. Iowa, 251 F.3d 713, 716 (8th Cir. 2001) (citing Williams, 529 U.S. at 409-13).

By its terms, it is important to remember that § 2254(d)(1) "limits the benchmark precedent against which a habeas court may measure a state court decision to 'clearly established Federal law, as determined by the Supreme Court of the United States.'" O'Brien v. Dubois, 145 F.3d 16, 20 (1st Cir. 1999), *overruled on other grounds.*  Thus, even if lower federal court decisions support Petitioner's position, "the writ cannot issue unless the state court decision contravenes, or involves an unreasonable application of, extant Supreme Court jurisprudence."  Id.  Nevertheless, "[t]o the extent that 'inferior' federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue."  Atley v. Ault, 191 F.3d 865, 872 (8th Cir. 1999) (citing O'Brien, 145 F.3d at 25) ("If no Supreme Court precedent is dispositive of a petitioner's claim, then, a fortiori, there is no specific rule to which the state court's decision can be 'contrary.' In

such circumstances, a federal habeas court then determines whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence.  This reduces to a question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable. To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness vel non of the state court's treatment of the contested issue.").

Under § 2254(d)(2), a state court decision involves "an unreasonable determination of the facts in light of the evidence presented in state court proceedings," only if it is shown that the state court's presumptively correct factual findings do not enjoy support in the record.  28 U.S.C. § 2254(e)(1).  Pursuant to § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

With these standards of review in mind, this Court now turns to the Petition.

## III.   DISCUSSION

Petitioner's ineffective assistance of counsel claim is based on: (1) his trial attorneys' failure to cross-examine Willie about Corodarl's prior crimes and adjudications, including an assault with a gun during a robbery in a motor vehicle, after the state had elicited testimony from Willie that Corodarl was a peacemaker who had never been in trouble; and (2) trial counsel's withdrawal of a motion to suppress the videotape of Petitioner's statement to police.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To state a claim for ineffective assistance of counsel, Petitioner "must demonstrate that (1) 'counsel's representation fell below an objective standard of reasonableness;' and (2) 'the deficient performance prejudiced the defense.'" Miller v. Dormire, 310 F.3d 600, 602 (8th Cir. 2002) (quoting Strickland, 466 U.S. at 687-88); see also Williams v. Norris, 612 F.3d 941, 954 (8th Cir. 2010) ("To prevail on a Strickland claim, a defendant must show that his counsel was deficient and that the deficient performance prejudiced the defense."). "To satisfy the second part of the Strickland test, the petitioner must prove that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Garrett v. Dormire, 237 F.3d 946, 950 (8th Cir. 2001) (quoting Strickland, 466 U.S. at 694); Miller, 310 F.3d at 602 (same); see also Yoder v. United States, NO. 08-2962, 352 Fed. Appx. 123, 2009 WL 3789928 at *1 (8th Cir. Nov. 13, 2009) ("for ineffective-assistance claim, movant must show that counsel's representation was deficient, and that it prejudiced his case such that there is reasonable probability that result would have been different.") (citation omitted). In ineffective assistance of counsel claims, there is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy. Strickland, 466 U.S. at 689; see also Marcrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007) ("the burden of proof is on the petitioner to show that 'his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'") (quoting Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)); Collins v. Dormire, 240 F.3d 724, 727 (8th Cir. 2001) (in determining

whether counsel's performance was deficient, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . .") (quoting Strickland, 466 U.S. at 689).

A.   **Trial Counsel's Failure to Cross-Examine Willie Regarding his Testimony that Corodarl was a Peacemaker Who Had Never Been in Trouble**

With respect to Willie's testimony that Corodarl had problems, but that he was a peacemaker, Petitioner complains that his trial counsel failed to cross-examine Willie regarding Corodarl's adult and juvenile criminal record.  See Petitioner's Memorandum of Law in Support of Petition for a Writ of Habeas Corpus [Docket No. 3] ("Pet.'s Mem."), pp. 26-29.  As a result, Petitioner argued that the jury never had the opportunity to hear about Corodarl's criminal record, which included robbery, that would have corroborated Petitioner's claims that he was acting in self-defense when Willie and Corodarl tried to rob him and would have made the jury more skeptical of Willie's version of what happened.  Id., pp. 28-29.

Respondent countered that Petitioner cannot meet his burden of showing a reasonable probability that he would have been acquitted if his trial attorneys had cross-examined Willie about Corodarl's background, given that while Petitioner called witnesses at his post-conviction hearing on his ineffective assistance of counsel claim, he did not present any evidence that Willie was aware of Corodarl's criminal record, or that Corodarl was not, in fact, "a peacemaker."  See Respondent's Memorandum in Support of Answer in Opposition to Petition for Writ of Habeas Corpus [Docket No. 18] ("Resp.'s Mem."), pp. 15-16.  Respondent argued that speculation about what would have been achieved during cross-examination is not sufficient to show a reasonable

probability of acquittal, especially in light of the strong evidence against Petitioner, the fact that the statement was brief, and was never mentioned in closing argument.  Id.

In reply, Petitioner asserted that given Willie was Corodarl's brother, was his accomplice to a felony drug crime and Corodarl was taken out of the home for his delinquent acts, Willie certainly knew of Corodarl's past.  See Petitioner's Memorandum of Law Replying to Respondent's Answer in Opposition to Petition for Writ of Habeas Corpus [Docket No. 20] ("Pet.'s Reply").  Furthermore, even if Willie was unaware of Corodarl's entire record, including Corodarl's participation in an armed robbery of a victim in a car who was shot twice, Petitioner submitted that evidence of the incidents was admissible because the state opened the door to it by eliciting Willie's misleading representation of Corodarl.  Id.

Petitioner provided no evidence to the post-conviction court or to this Court of the substance of Willie's expected testimony or how his theoretical testimony would have affected the outcome of Petitioner's trial.  While presumably Willie would have known about his brother's juvenile narcotics arrest, since he was involved (see Ex. E (Juvenile Criminal Records)), there is no evidence before this Court to suggest that Willie would have known about or recalled Corodarl's juvenile involvement in a robbery or role in Corodarl's breaking a window at his girlfriend's home.  Further, even if testimony had been elicited from Willie about Corodarl's juvenile narcotics record, this Court has no reason to conclude that this testimony would have swayed a jury to believe that Petitioner acted in self-defense without premeditation, given that the record was replete with evidence that Corodarl was involved with a drug transaction at the time of his death.  Likewise, even assuming that Willie recalled Corodarl's juvenile involvement in a

April 2000 robbery (see Ex. E (Juvenile Criminal Records)) or Corodarl's involvement with criminal damage to property prosecution in March 2005 (see Ex. M (Adult Criminal Record)), Willie could have testified that those actions were in Corodarl's past and that he had since turned his life around.  The point is that without any evidence as to Willie's possible testimony, this Court is left to speculate as to its contents and its potential affect on the outcome of Petitioner's case, which this Court cannot do.  Petitioner's failure to present such evidence is fatal to an ineffective assistance of counsel claim. See Rodela-Aguilar v. United States, 596 F.3d 457, 462 (8th Cir. 2010) (quoting Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009)) ("a claim of ineffective assistance based on the failure to consult and call an expert requires 'evidence of what a scientific expert would have stated' at trial in order to establish Strickland prejudice."); United States v. Delgado, 162 F.3d 981, 983 (8th Cir. 1998) (concluding that naked assertions that an attorney failed to call exculpating witnesses are insufficient to show counsel was ineffective or that defendant was prejudiced); Smith v. Roehrich, NO. CIV. 08-6113 (RHK/JJK), 2009 WL 3615022 at *7 (D. Minn. Oct. 27, 2009) ("Petitioner's assertion that his trial counsel failed to call expert witnesses fails for the same reason that his assertions regarding other defense witnesses fail; specifically, Petitioner has not identified who the expert witnesses are who allegedly should have been called to testify, what their testimony would have been, and how that testimony would have benefited Petitioner's defense.") (citation omitted); Gail v. Dingle, Civil No. 08-404 (JMR/JSM), 2010 WL 681302 at *10 (D. Minn. 2010) ("Petitioner's failure to provide how the subpoenaed witnesses would have testified, identify the expert witness and how he or she would have testified, and why such additional evidence, including the use of the

Hennepin County Examiner's report, would likely have affected the result of his trial, is fatal to his ineffective appellate counsel claim.").

For all of these reasons, this Court finds that the state court's decision regarding Petitioner's ineffective assistance of counsel claim based on his attorneys' failure to cross-examine Willie about Corodarl's prior crimes and adjudications was neither contrary to, nor did it involve an unreasonable application of the decisions of the United States Supreme Court. Additionally, this Court finds that the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented during the state court proceedings. Therefore, Petitioner's claim on this basis should be dismissed.

**B.      Withdrawal of the Motion to Suppress**

Petitioner submitted the Minnesota Supreme Court did not address whether a motion to suppress would have had merit, and instead only stated that there was no reasonable probability that, but for counsels' alleged errors, the outcome of the proceedings would have been different based the conclusion that it had already reached that the videotape's admission did not affect his substantial rights. See Pet.'s Mem., p. 29. According to Petitioner, this was an unreasonable application of Strickland, as the Minnesota Supreme Court never concluded that the videotape did not affect his substantial rights. Id., p. 30.

The Minnesota Supreme Court found:

> With respect to the videotape, having already concluded that its admission did not affect Pearson's substantial rights, we also conclude that there is no reasonable probability that, but for Pearson's counsel's alleged errors, the outcome of the proceedings would have been different.

Pearson, 775 N.W.2d at 165 (emphasis added).

Petitioner is correct that the Minnesota Supreme Court did not specifically address why there was no reasonable probability that, but for Pearson's counsel's failure to assert the motion to suppress, the outcome of the proceedings would have been different.   Rather, the court focused on the use of the video tape as rebuttal evidence, including the references to the possibility that Petitioner's girlfriend might terminate her pregnancy and the discussion about Petitioner's likely bail and sentence. Id. at 162.   However, while the court may not have provided specific reasoning, it did ultimately conclude, separately from the rebuttal evidence, that there was no reasonable probability that, but for Petitioner's counsel's alleged failure to maintain his motion to suppress the statement he gave to Officer Aguirre, the outcome of the proceedings would have been different.   Id. at 165.

Petitioner argued that he was prejudiced by his counsels' withdrawal of the motion to suppress his statement to Officer Aguirre, as there is a reasonable probability that had the jury not seen that videotape, it would not have concluded that the shooting was not premeditated or that he shot Corodarl in self-defense.   See Pet.'s Mem., p. 31. In particular, Petitioner argued that the impression of him by the jury "would have been much more favorable had they not watched the hour-long videotaped statement played immediately before they deliberated," given that the video "depicts Pearson as an already convicted dangerous criminal—wearing his orange jail suit and using obscenities and other offensive language."   Id., p. 32.   Petitioner also argued that the decision not to challenge the statement was not based on trial strategy and that the

motion to suppress would have been granted because he had invoked his Sixth Amendment right to counsel shortly after the interview started.  Id., p. 33.

Petitioner pointed to the following exchange between him and Officer Aguirre:

> A: You gotta give them something. You gotta, you gotta…
>
> P: Like, honest to god, I don't know what the f*** is going on.
> A: You gotta give um, your side of the story.
>
> P: That's what I'm trying to figure out, what the hell is going
>
> on.
>
> A: Well, you gotta give um, your side of the story.
>
> P: Is there is there any way that I ummmm, I need to figure out who the f*** my lawyer is. This b**** was going to find a lawyer for me.
>
> A: That's cool.
>
> P: And I called her and told her what's going on [inaudible]. Basically to try and see what's going on with this f*****g they got a thing where I can't use the phone.
>
> A: Yeah
>
> P: When they going to take that off?
>
> A: I don't know if they'll ever take it off. Just telling you straight up, I don't know.

Id., pp. 32-33 (quoting Ex. G, pp. 6-7).

Respondent countered that although Petitioner attacked his counsels' withdrawal of their motion to suppress the videotape of his statement to Officer Aguirre, contending that during his interview, he made an unequivocal request for counsel, he only stated that he needed to figure out whom his lawyer was, but never asked to talk to counsel. See Resp.'s Mem., pp. 18-19.  Respondent also noted that Petitioner testified at the trial

that he talked to Officer Aguirre because he was on the same wrestling team as Officer Aguirre and because Aguirre's brother was his best friend; Petitioner had initiated the conversation by having a deputy at the jail call Officer Aguirre to talk to him; and Petitioner testified that he was not forced to talk to Officer Aguirre. Id., p. 19.   In addition, even if counsel should have moved to suppress the statement, Respondent asserted that there is no reasonable probability that the admitted videotape led to Petitioner's conviction, as Petitioner admitted in his trial testimony that he lied to Officer Aguirre throughout their conversation, he was using the interview to get information from Officer Aguirre, and the statement contained no inculpatory information.  Id., pp. 16-17.

In reply, the Petitioner reiterated that he had unequivocally requested legal counsel during his interview with Officer Aguirre--which means that the statement would have been suppressed--and the evidence was important given that the state court found that the videotape was the "best evidence" available for the jury to use in evaluating the credibility of Petitioner's trial testimony that he shot Corodarl in self-defense.  See Pet.'s Reply, pp. 8, 12-14.

Other than the exchange above, where Petitioner mentioned a lawyer, the following are other excerpts where Petitioner made references to either a lawyer or an attorney:

> Pearson:  It will all figure out. I told you I have a good ass attorney by in the morning. I didn't shoot anyone. They can put me on the lie detector, whatever they want. I didn't shoot anyone. I didn't see anyone get shot or anything like that. All that other shit they talking about, I don't know, what the fuck they talking about. Could you make a call for me?
>
> INTERVIEWER:  Who do you want me to call?

Pearson:  Just call 651.

INTERVIEWER:  Who is it?

Pearson:  It's that girl I'm just tellin' her it's that girl I'm just tellin' her to hurry up, hurry up and send that attorney and send that attorney up here to see me.

INTERVIEWER:  All right. I'll ask, I'll ask the, the ah, the investigator if they'll let you make that call.

* * *

INTERVIEWER: All right. Tell me straight up. Every time I keep asking you this, you kinda, you kinda hypothetical just hypothetical that right. Okay. Tell me straight up one hundred percent what happened exactly that day. I know· you already told me two or three times - all right?

Pearson:  Now what I'm tryin' to make sure I don't do is I don't get my hands so when I, when it comes time for my lawyer to be here, I'm not already, I already talked to a million people about what was, about what went on with me that day, so when they said I'm the shooter in the court room, I know I'll beat the case right there. [inaudible] that's all I'm tryin' to do is keep a little keep safe with me. Cause I guarantee y'all I got proof of where I was when what went down.

INTERVIEWER: I know you just told me where you were - right?

***

INTERVIEWER: Yeah. You know what you just told me a minute ago. You said there's a pretty good chance and you're playin' with your life here. You're not even talking about getting shot. [inaudible] You're talking about spending the rest of your life behind bars and you're saying' like pretty much. Pretty much can be now that sounds [inaudible] one hundred percent.

Pearson:  That, that's what I'm tryin' to see. I should have probably like a decent attorney a good attorney and I didn't do shit so what should I have to worry about.

INTERVIEWER: Uh hum.

Pearson:  They didn't find anything on me physically.

25

Ex. G, pp. 29,  41.

This Court concludes that trial counsels' decision to withdraw the motion to suppress after reviewing the tape did not amount to representation that fell below an objective standard of reasonableness.   An individual's Miranda right to counsel only attaches when an individual invokes the right during custodial interrogation by making a clear and unequivocal request for counsel.   See Davis v. United States, 512 U.S. 452, 458-62 (1994) (holding that defendant's statement, "maybe I should talk to a lawyer," was ambiguous and did not require officers to clarify); Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001) ("Considering the question in context, it is not clear that Wilkinson was actually requesting the presence of an attorney when he asked 'Could I call my lawyer?'").

In this case, after Petitioner was read his Miranda rights and agreed to speak to Officer Aguirre, Petitioner made no unequivocal request for the presence of legal counsel.   At best, Petitioner was wondering out loud who his attorney was, whether some unidentified woman was supposed to help him get one, and whether he should have a "decent" or "good" attorney.   But there is no evidence that he made a request for an attorney.[4]   Accordingly, any such motion to suppress, had it been brought, would have most certainly been denied.

---

[4]     This Court notes that Officer Aguirre told Petitioner that he had to go over Petitioner's Miranda rights before speaking with him because Petitioner had previously asked for an attorney.   However, this Court has no information regarding Petitioner's previous request for counsel.   In addition, no argument was raised to the Minnesota Supreme Court or to this Court that his trial counsel should not have withdrawn the motion to suppress his statement to Officer Aguirre on the basis that he had asked for an attorney prior to the administration of the Miranda rights.   In any event, the evidence before this Court is that Petitioner agreed to have the Miranda rights read to him and

In addition, even if his counsel had moved to suppress the interview and had been successful, Petitioner ignores the fact that the state introduced the statement for to challenge Petitioner's credibility and demeanor.  <u>See</u> <u>Oregon v. Hass</u>, 420 U.S. 714, 724-25 (1975) (finding that a suppressed statement was properly used to impeach during rebuttal); <u>Harris v. New York</u>, 401 U.S. 222, 224-26 (1971) (finding that the government could use the defendant's prior inconsistent statement as rebuttal testimony to impeach the defendant's credibility, regardless of whether there was a <u>Miranda</u> violation); <u>Krimmel v. Hopkins</u>, 44 F.3d 704, 709 (8th Cir. 1995) (finding that the prosecution could use statements that are inadmissible in its case-in-chief to impeach a defendant's credibility).  Indeed, the Minnesota Supreme Court found that that the trial court did not commit reversible error when it admitted as rebuttal evidence a partially redacted videotape of defendant's conversation with Officer Aguirre.  <u>See</u> <u>Pearson</u>, 775 N.W.2d at 160-61.  Petitioner did not challenge this ruling by the Minnesota Supreme Court in his habeas petition.  Thus, any failure to seek suppression did not affect the introduction of the videotape for rebuttal purposes as evidence regarding Petitioner's credibility.

Finally, even assuming that the motion to suppress been granted and the videotape was not shown to the jury, there is no reasonable probability that, but for counsel's errors, the result of the proceeding would have been different—<u>i.e.</u>, that the jury would have found that Petitioner acted in self-defense or without premeditation. Petitioner's argument is premised on his belief that the impression of him by the jury

---

then after they were administered, he signed the <u>Miranda</u> form and agreed to talk to Officer Aguirre.  <u>See</u> Ex. G, p. 2; Ex. K.

would have been much more favorable had they not watched the hour-long videotaped statement immediately before they deliberated.   This is not a situation where the videotape contained a statement by Petitioner that he killed Corodarl in order to rob him or evidence that would have cast doubt into his self-defense claim, such that the Court could make a determination that there is a reasonable probability that the jury's decision would have been different.   In sum, the videotape contains no inculpatory evidence against Petitioner and any speculation on the jury's impression of Petitioner after viewing the video is just that–mere conjecture.

For all of these reasons, the Court finds that trial counsel's failure to pursue a motion to suppress the videotaped interview between Petitioner and Officer Aguirre did not fall below the objective standard of reasonableness and caused Petitioner no prejudice.   Therefore, the Minnesota Supreme Court correctly applied the Strickland analysis to Petitioner's ineffective assistance of counsel claims and its decision regarding Petitioner's ineffective assistance of counsel claim was neither contrary to, nor did it involve an unreasonable application of the decisions of the United States Supreme Court.   Additionally, this Court finds that the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   Therefore, Petitioner's claim on this basis should be dismissed.

## IV.   CERTIFICATE OF APPEALABILITY

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition by a district court unless he is granted a Certificate of Appealability, ("COA"). See 8 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).   In order to obtain a COA, a

petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). In order to make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. Daniel</u>, 529 U.S. 473, 484 (2000).

Here, the Court finds that it is highly unlikely that any other court, including the Eighth Circuit Court of Appeals, would decide Petitioner's claims any differently than they have been decided here. Petitioner has set forth, nor can the Court independently discern, anything in his matter that warrants appellate review. Therefore, it is recommended that Petitioner should not be granted a COA as it pertains to the Amended Petition.

## V.    RECOMMENDATION

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1.     Larry Demetrius Pearson's Petition for Habeas Corpus by a Person in State Custody [Docket No. 1] be **DISMISSED WITH PREJUDICE**.

2.     It is further recommended, pursuant to 28 U.S.C. § 2253(c), that a Certificate of Appealability not be issued.

Dated:       June 14, 2012


                         s/ *Janie S. Mayeron*
                         JANIE S. MAYERON
                         United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 28, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.